UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LATHERIAN HARRIS,

               Plaintiff,                          Case No. 1:20-cv-13075

v.                                         Honorable Thomas L. Ludington
                                                 United States District Judge

CITY OF SAGINAW, *et al.*,

               Defendants.

_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For longtime Saginaw resident Latherian Harris, the evening of November 10, 2018 began as many others had: with a quick trip to the local corner store. The evening took a turn for the worse, however, when a verbal dispute with one of the store clerks allegedly ended with a pointed gun. Harris spent of the next couple weeks in the Saginaw County Jail. But he was *not* the alleged assailant.

As Harris tells it, he was in the store, purchasing beer for a friend, when one of the clerks demanded that he turn his music down. Feeling disrespected, Harris offered to fight the clerk outside and exited the front of the store. When the clerk declined his challenge, Harris left the premises and began walking around the side of the store toward a laundromat where his friend worked. As Harris was crossing behind the store, the clerk allegedly opened the back door, pointed a pistol at Harris, and taunted him with racial slurs.

On the advice of his friend, Harris called 911 and told the operator what had happened—specifically, that the clerk had assaulted him near the "back door" of the store. Yet for reasons that are still unclear, the responding officers thought Harris was claiming that the clerk followed him

from the *front* of the store. When the security footage failed to support that claim, and the store clerk denied following Harris or brandishing a gun, the officers arrested Harris for filing a false felony report. The charge was eventually dismissed, and Harris brought this action for false arrest under 42 U.S.C. § 1983.

The parties have filed cross motions for summary judgment. Harris argues that the officers lacked probable cause to arrest him because they only considered the evidence that supported the clerk's version of events, ignored Harris's version, and declined to review all available security footage. He also claims that the City of Saginaw failed to adequately train and supervise the officers on determining probable cause.

In response, Defendants assert that their investigation was reasonable under the circumstances and that Harris did not clarify where the altercation occurred until *after* they had reviewed the security footage. They also defend the City's training policy, arguing that Harris has not produced any evidence of deliberate indifference.

Defendants' motion will be granted in part and denied in part. One of the five officers that Harris has sued will be dismissed for lack of personal involvement in the arrest. The City will also be dismissed because no reasonable juror could find that it was deliberately indifferent to Harris's rights. As to the remaining officers, a genuine dispute of fact exists regarding whether they arrested Plaintiff without probable cause.

Conversely, Harris's motion will be denied because a reasonable juror could find that either (1) the officers had probable cause to arrest him or (2) could have reasonably believed that they had probable cause to arrest him.

## I.

## A.

At around 8:30 PM, Saginaw County 911 received a call from a man complaining of a felony assault outside a corner store in the City of Saginaw. *See* 911 Tr., ECF No. 41-9 at PageID.736. The caller, Plaintiff Latherian Harris, told the dispatcher that he was walking behind the store when one of the store clerks, whom he had argued with moments before, "came around the back door" and "pointed a gun [at him]." *Id.*

Four Saginaw police officers responded to the call: Megan Nelson, Steven Lautner, Tyler Cece, and Jordan LaDouce.[1] Officer Nelson led the investigation.

When the officers arrived, Plaintiff was standing outside a laundromat near the corner store where the incident occurred. The laundromat and the store were situated perpendicularly to each other on the same commercial lot but faced different roads. A small alleyway ran between the two buildings.

As the officers approached—and before any officer had spoken to Plaintiff or the store clerks—Officer Nelson said under her breath, "This guy's a fucking liar."

The officers stood silently in a line outside the laundromat while Plaintiff reenacted his encounter with the clerk. As Plaintiff explained, he was in the store to purchase beer for a friend who works at the laundromat when one of the two clerks told him to turn his music down. Plaintiff, who was playing music on his cell phone, was offended by the clerk's demanding tone and asked why he was being "disrespect[ful]." After exchanging some words, Plaintiff offered to fight the

---

[1] Unless otherwise indicated, the facts in this section derive from bodycam footage filmed by Officers Nelson and LaDouce.

clerks outside. As Plaintiff was walking outside the store, he saw the "tall" clerk "r[unning] to the end of the counter" with a "gun behind his back."

At this point in the reenactment, Plaintiff pointed to his left, toward the alleyway behind the store, and stated:

> I cut through there through the, um, through the, um, store, it's like a little alley right here, I cut right through from the store to the—from the laundromat to the store you can cut right through here where that vans at. And, um, the guy came—the tall guy came all the way back to that van and pulled the, um, he cocked it back. It's like a black—all black like a nine-millimeter[2] cocked it back and pointed at me and say, "I'll kill you, nigger." Then he said, "Where's your mama? Where's your daddy? How many dad's you got?"

Officer Lautner looked incredulous: "So you're basically telling me that this guy pointed a gun at you for getting into a verbal argument with him?" When Plaintiff responded affirmatively, Officer Lautner laughed, "You realize how ridiculous this sounds, right?"

Despite the officers' skepticism, Plaintiff insisted that he was telling the truth. So, Officer Nelson went to interview the clerks.

She first spoke with the shorter clerk, who was standing behind the counter when she entered. She asked him whether "[he] had an issue with a gentleman just a few minutes ago?" The clerk looked confused and shook his head "No." Officer Nelson continued, "Something about a guy playing some music? Said you guys pulled a handgun out on him?" The clerk then looked over at his taller colleague, who had approached while the two were talking.

Answering the officer's questions, the tall clerk confirmed that Plaintiff had been in the store but denied that he followed him out of the store or brandished a gun. According to the clerk, Plaintiff refused to turn down his music and tried instigating a fight, so the clerks told him to leave.

---

[2] In his deposition, Plaintiff clarified that he "do[es not] know guns" and used the term "nine millimeter" only because the gun he saw had a "slide top." ECF No. 32-4 at PageID.198.

The clerk added that he briefly stepped outside the front door of the store to ensure that Plaintiff was gone.

After hearing the clerk's explanation, Officer Nelson asked to see the store's security footage. By this point, Officers Lautner and LaDouce had joined Nelson in the store. She turned to them and said, "It sounds like exactly what [Plaintiff] said but opposite."

The security footage was kept on a computer in a small office inside the store. As the clerk and the officers were entering the office, the officers asked him whether there were any firearms on the premises. He said that there were some "BB guns" but denied that there were any actual firearms.

Based on the computer display, there appeared to be over a dozen security cameras in and around the store. Officer Nelson asked the clerk whether the store had any cameras "right outside." The clerk suggested two options on the display, one of which was just outside the store's front door. Officer Nelson asked him to replay the footage from that camera, remarking that she "d[i]dn't care what happened in[side]."

The footage showed Plaintiff exiting the store while giving the middle finger to someone inside. He then walked out the frame, toward the alleyway between the store and the laundromat. Consistent with the clerk's story, the footage then showed the clerk briefly walking outside the front door and looking toward the alleyway before returning inside. He did not appear to have a weapon.

As the footage concluded, the clerk again explained that he only stepped outside to verify that Plaintiff had left. The clerk also claimed that he did not have "anything in his hands" at the time. During the crosstalk, the clerk again mentioned the presence of a "BB gun" in the store, but the officers did not ask to see it. Nor did they ask to see any other camera angles.

Once outside the office, Officer Nelson turned to Officer Cece and asked whether Plaintiff was still at the laundromat. When she learned that he was, she quipped, "Oh, good. Then let's go arrest him."

All four officers returned to the laundromat and asked Plaintiff to step outside. Officer Nelson then confronted him:

| | |
|---|---|
| Officer Nelson: | You still want to file this report? |
| Plaintiff: | Yeah, did you guys see the film over there? |
| Officer Nelson: | Yeah, I watched the film. You still want to file—you still want to file the report? |
| Plaintiff: | Yeah. |
| Officer Nelson: | Okay. |
| Plaintiff: | You guys see I'm telling the truth? |
| Officer Nelson: | No. |

"What?" Plaintiff exclaimed, "Are you serious?" Officer Lautner nodded his head, "We watched the video. That's not gonna lie." Visibly outraged, Plaintiff began pointing to the back of the store where a white van was now visible, shouting "he was right here by the van!" Despite not watching the footage from inside the store, Officer Nelson responded, "[The clerk] never even came to this back."

Having failed to convince the officers, Plaintiff threw his hands up in defeat and began walking away. As he did so, Officer Nelson grabbed him by the arm and told him that he was being arrested for filing a false felony report, punishable by up to four years in prison. *See* MICH. COMP. LAWS § 750.411a(1)(b). Officers Cece and LaDouce helped handcuff Plaintiff, while Officer Lautner observed from a few feet away. His hands now cuffed behind his back, Plaintiff became increasingly distressed, pleading with the officers to believe him. Officer Nelson replied, "You didn't say anything about no back doors or anything like that [previously]." When Plaintiff

exclaimed, "Yes I did! I told the lady on the phone," Officer Nelson remarked, "Now your story's changing 13 different times."[3]

At this point, Plaintiff's friend at the laundromat, Donald Henderson, came outside and began speaking with the officers. According to Henderson, Plaintiff told him about the incident right after it happened—specifically, that the "[clerk] came out the back door with a gun." Officer Nelson did not interview Henderson or include him in her report.

While transporting Plaintiff to jail, Officer Nelson radioed Officer LaDouce and asked him to return to the corner store and record a video of the security footage "showing that [the clerk] never even went out after [Plaintiff]." She told him that the video might be necessary "for court."

As requested, Officers Lautner and LaDouce returned to the store to record the security footage.[4] While there, they asked the tall clerk whether the store had a back door. He confirmed that it did, but he denied that store employees used it.[5] He then led the officers to a dimly lit hallway in the back of the building, which contained the back door. Officer Lautner opened the door and briefly looked outside. From the angle of the body camera, it is unclear whether there was a van outside like the one Plaintiff had pointed to, and Officer Lautner, during his deposition, could not recall opening the door. *See* ECF No. 32-13 at PageID.280–81.

As the group walked back to the front of the store, Officer Lautner remarked, "This guy is fucking lying. You guys aren't going to go through all that."

---

[3] During her deposition, Officer Nelson could not remember whether she reviewed Plaintiff's 911 call before arresting him. *See* ECF No. 32-12 at PageID.236–37.

[4] During his deposition, Officer LaDouce stated that he reviewed footage from "all available . . . angles of the building," but he could not recall whether he saw footage from behind the building. *See* ECF No. 32-15 at PageID.315. His bodycam footage only shows him reviewing footage from the front door.

[5] By contrast, Henderson testified during his deposition that store employees regularly used the back door when carrying trash to the dumpster. *See* ECF No. 34-8 at PageID.505.

**B.**

Officer Nelson submitted her police report to Detective Patrick Busch, who in turn submitted it to the local prosecutor. *See* Busch Dep. Tr., ECF No. 32-16 at PageID.361–63. Plaintiff spent 18 days in the Saginaw County Jail before being released on bond. *See* Court Records, ECF No. 34-18 at PageID.553–54. His charge was eventually dismissed when the responding officers failed to appear for the preliminary exam. *Id.* at PageID.554. Plaintiff then brought this action against the four officers, Detective Busch, and the City of Saginaw, alleging false arrest and false imprisonment.

The parties have filed cross motions for summary judgment. ECF Nos. 32; 34. Plaintiff argues that the responding officers and Detective Busch (collectively, the "Officer Defendants") arrested him without probable cause in violation of the Fourth and Fourteenth Amendments. *See* ECF No. 34 at PageID.442–45. Specifically, he faults them for not reviewing all the relevant security footage, not searching the clerk and store for weapons, and not investigating the store's back door prior to his arrest. *Id.* Plaintiff also seeks to hold the City of Saginaw liable, arguing that it failed to train and supervise the Officer Defendants on determining probable cause. *Id.* at PageID.426–32.

Defendants maintain that their search was reasonable under the circumstances and that Plaintiff's story changed after they began investigating. ECF No. 32 at PageID.144, 149–53. They also assert qualified immunity, reasoning that a reasonable officer under the circumstances could have believed that probable cause existed. *Id.* at PageID.161–64. As for Plaintiff's claim against

- 8 -

the City, Defendants argue that there is no evidence of a deliberately indifferent training or supervision policy.[6] *Id.* at PageID.157–61.

Having reviewed the parties' briefing, this Court finds that a hearing is unnecessary and will proceed to address the pending motions on the papers. *See* E.D. Mich. LR 7.1(f)(2).

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When the moving party "also bears the burden of persuasion at trial, [its] 'initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."'" *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)); *Calderone v. United States*, 799 F.2d

---

[6] Defendants also seek summary judgment on a state-law claim of false imprisonment, but Plaintiff did not allege any state-law claims in his complaint. *See* ECF Nos. 1 at PageID.3–7; 41 at PageID.653 ("Mr. Harris' Complaint alleged no state claims of any kind, rendering Defendants' arguments concerning same completely irrelevant in this case").

254, 259 (6th Cir. 1986) ("[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984) (emphasis omitted))).

In reviewing cross-motions for summary judgment, courts must apply the proper standard of review for each motion and may not "treat the case as if it was submitted for final resolution on a stipulated record." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016)) (internal quotation marks omitted)).

### III.

The pending motions for summary judgment address the liability of the Officer Defendants and the City of Saginaw. Given the different legal standards that apply, the liability of the Officer Defendants will be addressed in Section III.A, while the liability of the City will be addressed in Section III.B.

### A.

Plaintiff brings this action under 42 U.S.C. § 1983, which creates a private cause of action for the deprivation of federal rights by persons acting under color of state law. *See* 42 U.S.C. §

1983. To prevail on a § 1983 claim against the Officer Defendants, Plaintiff must overcome qualified immunity.

Qualified immunity is a judicially created doctrine that "shields government officials from civil liability in the performance of their duties so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity, a plaintiff must show that "(1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).

Additionally, because "[e]ach defendant's liability must be assessed individually based on his own actions," *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), the plaintiff must show that each defendant "*personally*" violated her rights, *see Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) ("[A] plaintiff must demonstrate 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)); *see also Alexander v. Carter for Byrd*, 733 F. App'x 256, 268 (6th Cir. 2018) (holding that deputy sheriff was entitled to qualified immunity because he was not "personally involved in [the plaintiff's] arrest").

**i.**

The first issue is whether Defendants have shown the absence of any genuine dispute regarding the constitutionality of their conduct. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If not, the issue becomes whether Plaintiff has shown evidence of a constitutional violation "so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

Plaintiff argues that the Officer Defendants arrested him without probable cause in violation of the Fourth Amendment.[7] "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "Generally, probable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). "[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

As previously noted, Plaintiff was arrested for filing a false felony report. In Michigan, a person files a false felony report when she "intentionally makes a false report of the commission of a [felony]" to police or similar government officials, "knowing the report is false." MICH. COMP. LAWS § 750.411a(1). It is undisputed that Plaintiff reported a felony—specifically, felony assault. *See id.* § 750.82(1) ("[A] person who assaults another person with a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony . . . ."). The issue is whether the Officer Defendants had sufficient cause to believe that the report was false.

---

[7] Plaintiff's complaint also mentions a claim for false imprisonment, but the Sixth Circuit generally treats the two claims the same. *See Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) ("When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—those claims are identical, so we will simply refer to those two claims together as a false-arrest claim.").

This issue must be addressed separately for each of the Officer Defendants. *See Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) ("[A] plaintiff must demonstrate 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))).

**a.**

The analysis begins with Officer Nelson. Based on the evidence, Officer Nelson had two reasons to believe that Plaintiff was lying: (1) the clerk's statement and (2) the security footage.

As a matter of law, Officer Nelson could not arrest Plaintiff based on the clerk's statement alone. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 282 (6th Cir. 2020) ("[A]n allegation by one individual that another person committed a crime without further corroboration is insufficient to establish probable cause to arrest that person." (citing *Gardenhire v. Schubert*, 205 F.3d 303, 317 (6th Cir. 2000)).

In *Gardenhire*, police arrested a shopkeeper and her husband after a neighbor accused them of stealing her merchandise. *Gardenhire*, 205 F.3d at 308–09. Suspiciously, the investigating officers found the missing merchandise in the couple's shop window—that is, the window directly adjacent to the shop that they had allegedly burglarized. *Id.* Despite the couple's insistence that they had been framed by the neighbor, the police declined to investigate the matter further and arrested them for theft. *Id.* at 309. The couple sued for false arrest, and the district court denied qualified immunity to the police, concluding that a reasonable jury could find that the police lacked probable cause to arrest the couple. *Id.* at 310.

The Sixth Circuit affirmed. *Id.* At the center of its decision was the evidentiary significance (or insignificance) of uncorroborated allegations. The Sixth Circuit posed a hypothetical: "[A] woman flags down a police officer and points out a Porsche being driven by a young man, which

the woman claims is her car and which has been stolen by the man. Would the officer have probable cause to arrest the Porsche's driver at that point?" *Id.* at 317.

The answer, the court explained, was "No." *Id.* Although the officer would have reasonable suspicion to conduct a *Terry* stop, "[he] would not yet have the requisite 'reasonably trustworthy information' sufficient to warrant a prudent man in believing that the young man driving the Porsche had committed or was committing an offense." *Id.* at 317. In the same way, the police in *Gardenhire* had reasonable suspicion to stop the couple, "inquire as to why the items were in their store," and "gather [more] information." *Id.* But without more, they could not make an arrest. *Id.*

Here, like in *Gardenhire*, Officer Nelson had the authority to act on her suspicions and to try to corroborate the clerk's story. The problem, according to Plaintiff, is that she seems to have missed some important details. Construing the record in his favor, Plaintiff told the officers that the clerk confronted him outside the back door, not the front. Yet Officer Nelson focused her investigation almost entirely on the front of the store, declining to even review the in-store footage.

Defendants' claim that Plaintiff changed his story is unpersuasive. Although Plaintiff's initial statement to the officers was difficult to follow, a reasonable juror could find that by pointing behind the store and stating that the clerk came "all the way back to that van," Plaintiff was saying that the clerk came out the back door.

A reasonable jury might also take issue with Officer Nelson's one-sided view of the evidence. Despite Plaintiff's claim that he saw the clerk run to the end of the counter with a gun behind his back, Officer Nelson did not review the in-store footage, frisk the clerk, or examine the "BB gun" that he apparently possessed. She also did not interview Plaintiff's friend, Donald Henderson, or inquire with Saginaw County 911 to determine whether Plaintiff's story had changed. And to the extent that Officer Nelson seeks to rely on Officer Lautner and LaDouce's

investigation of the back door, her reliance is misplaced, given that she had already arrested Plaintiff by then. *See Alexander*, 733 F. App'x at 267 ("This Court has held that when a suspect is placed in the back of a police car, the suspect is considered to be under arrest." (citing *United States v. Shaw*, 464 F.3d 615, 622 (6th Cir. 2006))).

Accordingly, a reasonable jury could infer that Officer Nelson relied solely on the clerk's uncorroborated allegation and therefore lacked probable cause to arrest Plaintiff.[8] *See Ouza*, 969 F.3d at 282.

Importantly, this is not to say that Officer Nelson had a duty to investigate every aspect of Plaintiff's story. *Gardenhire* expressly disclaimed such a duty, noting that "an officer does not have to investigate independently every claim of innocence." *Gardenhire*, 205 F.3d at 318 (citing *Baker v. McCollan*, 443 U.S. 137, 145–56 (1979)). Instead, the point of *Gardenhire* is that investigating officers (1) may not rely solely on a witness's "bare allegation[s]" and (2) "must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if [they] ha[ve] probable cause to make an arrest." *Id.* (citing *Est. of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)). These insights are consistent with the notion that probable cause is a "practical and common-sensical standard," intelligible to police officers and judges alike. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

Defendants' reliance on *Weser v. Goodson*, 965 F.3d 507 (6th Cir. 2020), is misplaced. In *Weser*, the Sixth Circuit held that police had probable cause to arrest a woman accused of

---

[8] The report of Defendants' expert, Phillip Abdoo, does not alter the analysis. Abdoo, a "retired Sergeant from the Macomb County Sherriff's Office," states that the Officer Defendants had probable cause to arrest Plaintiff based on their investigation. ECF No. 32-8 at PageID.215–16. But Abdoo assumes, like Defendants, that Plaintiff changed his story after the initial investigation. *Id.* at PageID.213. As explained above, a reasonable juror could think differently.

trespassing onto her coworker's property. *Id.* at 511–12. But the issue in *Weser* was whether the woman had consent to enter the property, and the undisputed evidence showed that she did not. *Id.* at 514–15. Here, by contrast, the issue is whether police had enough evidence to corroborate a witness's statement despite their apparent failure to consider "all inculpatory *and* exculpatory evidence." *Gardenhire*, 205 F.3d at 318. This issue involves delicate questions of fact that cannot be so easily resolved on the current record.

For similar reasons, Plaintiff's motion for summary judgment will be denied. This case turns largely on two questions of fact: (1) whether Plaintiff told the officers that the clerk came out the back door, and if so, (2) whether they reasonably misunderstood him. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("[S]earches and seizures based on mistakes of fact can be reasonable. . . . The limit is that 'the mistakes must be those of reasonable men.'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))). If the officers reasonably misunderstood Plaintiff, then a reasonable juror could find that the officers had probable cause to believe that he was lying. Although the totality of the evidence may tend to support Plaintiff's position, his initial statement to the officers was ambiguous enough for reasonable minds to disagree. *Cf. Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (requiring evidence "so powerful that no reasonable jury would be free to disbelieve it" (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001))).

For these reasons, there is a genuine dispute of fact as to whether Officer Nelson had probable cause to arrest Plaintiff.

### b.

Next is Officer Lautner. Because Officer Lautner had essentially the same information as Officer Nelson, a reasonable jury could find that he lacked probable cause to believe that Plaintiff

was lying. There is, however, a lingering issue as to whether Officer Lautner was "personally" involved in the arrest. *See Robertson*, 753 F.3d at 615.

For purposes of the Fourth Amendment, "[a] person is arrested when an 'officer, "by means of physical force or show of authority," terminates or restrains [her] freedom of movement.'" *Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (quoting *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010)). And there is no evidence that Officer Lautner applied physical force to Plaintiff or otherwise "restrain[ed] [his] freedom of movement." *Id.* Thus, Officer Lautner did not "arrest" Plaintiff in the same sense as Nelson, who put the handcuffs on him.

Still, Officer Lautner participated in the arrest in other ways. In addition to conducting Plaintiff's initial interview, Officer Lautner also contributed to the arrest decision. *See* ECF No. 32-13 at PageID.275 ("After we conducted our investigation, myself and other officers [in] the investigation sort of concluded at that time that there was enough probable cause to effect an arrest for making a false police report."). So, even though other officers put the handcuffs on Plaintiff, Officer Lautner played a significant causal role in the arrest. *Cf. Haywood v. Hough*, 811 F. App'x 952, 960 (6th Cir. 2020) ("Absent a showing of direct responsibility, 'an officer's 'mere presence' at the scene of an arrest fails to establish § 1983 liability.'" (quoting *Alexander v. Carter ex rel. Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018))).

Accordingly, a reasonable juror could find that Officer Lautner arrested Plaintiff without probable cause.

### c.

Next are Officers LaDouce and Cece. As with Officer Nelson, there is a genuine dispute of fact as to whether Officers LaDouce and Cece had probable cause to believe that Plaintiff was lying. And unlike Officer Lautner, both LaDouce and Cece helped handcuff Plaintiff.

Defendants argue that Officers LaDouce and Cece should be dismissed because neither contributed to the arrest decision. *See* ECF No. 32 at PageID.149. But Defendants do not cite any authority for this position, and this Court is not aware of any.

Generally, subordinate officers may be held liable for false arrest if a reasonable officer in their position could not believe, based on the supervisor's instructions and "their own knowledge of the surrounding facts and circumstances," that probable cause existed. *See Bunkley v. City of Detroit*, 902 F.3d 552, 562 (6th Cir. 2018); *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004))).

As a threshold matter, there is no evidence that Officer Nelson ordered LaDouce and Cece to help her handcuff Plaintiff. And Officer Cece stated during his deposition that he could have intervened and stopped the arrest if he thought it was unlawful. *See* ECF No. 32-14 at PageID.298. Further, even if Officer Nelson did order LaDouce and Cece to arrest Plaintiff, a reasonable juror could find that neither officer could have reasonably believed that probable cause existed. *See* discussion *infra* Section III.A.ii.

For similar reasons, Officer LaDouce's status as a trainee at the time of the arrest is irrelevant. He still participated in the arrest. And this Court is unaware of any freestanding exception for officers who are inexperienced or in training. *See, e.g.*, *Hopper v. Montgomery Cnty. Sheriff*, 310 F. Supp. 3d 911, 920 (S.D. Ohio 2017) (denying qualified immunity in excessive-force case to sheriff deputy who was a "trainee . . . completing his first day on the job").

For these reasons, a reasonable juror could find that Officers LaDouce and Cece arrested Plaintiff without probable cause.

**d.**

The last officer in question is Detective Busch. Detective Busch's only involvement in the case was submitting Officer Nelson's police report to the local prosecutor. *See* ECF No. 32-16 at PageID.361–63. There is no evidence that he participated in Plaintiff's arrest or had any reason to believe that it lacked probable cause. *Cf. Robertson v. Lucas*, 753 F.3d 606, 617 (6th Cir. 2014) (dismissing false-arrest claims against DEA agent who only worked surveillance and was not involved in arrest); *Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (dismissing false-arrest claims against sheriff deputy who did not participate in arrest except for presence on the scene and consultation with arresting officer regarding charges). Accordingly, Detective Busch will be dismissed.

**e.**

In summary, there is a jury-submissible question regarding whether Officers Nelson, Lautner, LaDouce, and Cece arrested Plaintiff without probable cause. Detective Bush, however, was not personally involved in Plaintiff's arrest and, therefore, must be dismissed.

**ii.**

The second issue is whether Plaintiff's right to be free from arrest was clearly established in this case. *See McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).

"A right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate . . . .'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 563 U.S. 731, 741 (2011)). Stated differently, "[a] Government official's conduct violates

clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Moderwell*, 997 F.3d at 660 (quoting *Ashcroft*, 563 U.S. at 741).

At the time of Plaintiff's arrest, "[t]he constitutional right to 'freedom from arrest in the absence of probable cause' [was] clearly established within [the Sixth Circuit]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)); *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007); *see also Wright v. City of Euclid*, 962 F.3d 852, 874 (6th Cir. 2020) ("[T]he right to be free from arrest without probable cause is a 'quintessential example[ ] of [a] "clearly established" constitutional right.'" (quoting *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020))).

Still, the Officer Defendants argue that they are entitled to qualified immunity because a reasonable officer in their position "could have believed that the arrest of Plaintiff was lawful." ECF No. 43 at PageID.878. They cite the Supreme Court's decision in *Anderson v. Creighton*, 483 U.S. 635 (1987), for the proposition that "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (quoting *Anderson*, 483 U.S. at 641).

In *Anderson*, the Supreme Court held that the Eighth Circuit erred by formulating the right at issue in a search-and-seizure case as "the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Anderson*, 483 U.S. at 640. The Court explained that when the "clearly established" prong is applied at such a high level of generality, "it [loses its] relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Id.* at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). Instead of considering whether a reasonable officer would know the

presumption against warrantless searches, the Eighth Circuit should have considered "whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.* at 641.

The Officer Defendants' citation to *Anderson* is unavailing. Although the "clearly established" prong requires a "high degree of specificity," *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018), it does not require a case "directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), or even a case with "'fundamentally similar' or 'materially similar' facts," *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)). "[R]ather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Hernandez v. Boles*, 949 F.3d 251, 261 (6th Cir. 2020) (quoting *Goodwin*, 781 F.3d at 325). And in this case, if the jury adopts Plaintiff's version of the facts—specifically, that the Officer Defendants either unreasonably misunderstood or deliberately ignored important details in his statement—then the Officer Defendants would have had "fair warning" that their conduct was unlawful.[9]

Since at least 2000, it has been clearly established that "an allegation by one individual that another person committed a crime without further corroboration is insufficient to establish

---

[9] Although qualified immunity is a legal question typically reserved for the court, it may be submitted to the jury when "the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)). Here, the immunity question turns on whether the Officer Defendants had probable cause and whether they knew or reasonably should have known that Plaintiff had described an altercation at the *back* door. Given the competing interpretations of his statement, these questions are best submitted to the jury. *See, e.g.*, *Green v. Throckmorton*, 681 F.3d 853, 865–66 (6th Cir. 2012) (holding that jury would decide qualified immunity in false-arrest case because immunity "turn[ed] on disputed facts" regarding field-sobriety test and "reasonable jurors could interpret the video evidence differently"); *McKenna v. Edgell*, 617 F.3d 432, 441–43 (6th Cir. 2010) (holding that jury would decide qualified immunity in unreasonable-search case because immunity turned on "highly factual characterization" of the officers' purpose in the search).

probable cause to arrest that person." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 282 (6th Cir. 2020) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 317 (6th Cir. 2000)); *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) ("An eyewitness identification will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness "was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation."'" (quoting *United States v. Amerson*, 38 F.3d 1217 (6th Cir. 1994) (unpublished table decision))).

Similarly, it was well established at the time of Plaintiff's arrest that an arrest may be reasonable despite mistakes of fact so long as the mistakes were reasonable. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("[S]earches and seizures based on mistakes of fact can be reasonable. . . . The limit is that 'the mistakes must be those of reasonable men.'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *Anderson*, 483 U.S. at 641 (holding that police officers are entitled to qualified immunity when they "*reasonably* but mistakenly conclude that probable cause is present" (emphasis added)).

Resolving all reasonable inferences in Plaintiff's favor, the only way that the Officer Defendants could receive qualified immunity at this juncture would be if a *reasonable* officer could have believed that she could arrest a person based on an *unreasonable* mistake of fact. In addition to being inherently illogical, such a holding would be contrary to clearly established law. *See Anderson*, 486 U.S. at 641.

For these reasons, at the time of his arrest, Plaintiff had a clearly established right to be free from an arrest supported only by a witness's uncorroborated statement. Whether that right was violated is ultimately a question for the jury.

**B.**

The next issue is whether either Plaintiff or the City is entitled to summary judgment on Plaintiff's failure-to-train/supervise claim.

Because § 1983 "does not permit a municipal entity to incur liability under a theory of *respondeat superior*," *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)), "[a] plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury," *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 690–91).

"One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). To succeed on a failure to train or supervise claim, the plaintiff must prove the following:

(1) the training or supervision was inadequate for the tasks performed;
(2) the inadequacy was the result of the municipality's deliberate indifference; and
(3) the inadequacy was closely related to or actually caused the injury.

*Id.* (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

A plaintiff may demonstrate that the municipality was deliberately indifferent by showing that it either (1) "failed to act 'in response to repeated complaints of constitutional violations by its officers[,]' . . . such that it 'was clearly on notice that the training int his particular area was deficient and likely to cause injury, *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)); or (2) failed to train its officers when the need for training "[was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," *id.* (quoting *City of Canton*, 489 U.S. at 390). The latter

sort of liability is often referred to as "single-incident liability" because it does not require a pattern of constitutional violations. *Id.*

### i.

Relying on single-incident liability, Plaintiff first argues that the City completely failed to train its officers on the probable-cause requirement. *See* ECF No. 34 at PageID.426–27. Plaintiff notes that, during Officer Nelson's deposition, she could not recall "what the Fourth Amendment stood for" or "whether she had ever been taught or trained regarding the Fourth Amendment." *Id.* at PageID.427. Similarly, he notes that Office LaDouce testified in his deposition that he "did not know" whether Plaintiff's arrest was lawful. *Id.* Plaintiff also emphasizes that, in 2017, the Saginaw Police Department circulated a policy memo regarding warrantless arrests that makes no mention of the term "probable cause." *Id.* at PageID.427–28 (noting that the memo uses the term "reasonable cause"); ECF No. 34-20 at PageID.558.

In response, the City claims that Plaintiff has mischaracterized Nelson's and LaDouce's testimony. *See* ECF No. 43 at PageID.862. It notes that, while Officer Nelson did not know what the Fourth Amendment "st[ood] for," she knew that an arrest requires probable cause, and that probable cause requires the consideration of all "relevant facts." *Id.* at PageID.862–63. Similarly, the City notes that Officer LaDouce "[believed] the arrest was lawful," even if he disclaimed knowing "every detail about the case." *Id.* at PageID.865. The City also submits an affidavit sworn by Saginaw Police Chief Robert Ruth, which states that City police officers, including the Officer Defendants, "are trained on the Fourth Amendment and the probable cause standard." ECF No. 43-2 at PageID.884.

The Sixth Circuit's decision in *Ouza* is instructive. In *Ouza*, a woman sued the City of Dearborn Heights and a group of its officers after they arrested her for assaulting her ex-husband

despite "obvious falsities" in his story. *Ouza*, F.3d at 274, 284. The City essentially conceded that it had not trained its officers on probable cause. *Id.* at 288–89. One of the officers even admitted that he had not had any probable-cause training in 14 years. *Id.* In reversing the district court's grant of summary judgment, the Sixth Circuit held that "the failure to provide *any* training on probable cause determinations . . . is constitutionally inadequate" and "may amount to deliberate indifference" for purposes of single-incident liability. *Id.* at 289.

Here, unlike in *Ouza*, Plaintiff's claim that the City "complete[ly] disregard[ed]" its duty to train the Officer Defendants is unsupported by the record. ECF No. 34 at PageID.426. Consider Officer Nelson's deposition. Instead of asking about the City's probable-cause training, Plaintiff's counsel asked Officer Nelson whether she knew what the Fourth Amendment "st[ood] for":

> Q:   Okay. Do you know what the Fourth Amendment to the United States Constitutio[n] stands for?
>
> [Defense Counsel]:   I'm objecting to the extent that this calls for a legal conclusion, but go ahead and answer, if you know.
>
> A:   I guess, I'm not sure why you're asking that.
> Q:   I want to know what you know [sic] what the Fourth Amendment to the United States Constitution stands for?
> A:   No, I don't know.
> Q:   Okay. No one's ever taught you that, no one's ever trained you on that?
>
> [Defense Counsel]:   Objection, form, foundation, calls for a legal conclusion.
>
> Q:   Go ahead.
> A:   Yeah, I don't know.

ECF No. 32-12 at PageID.253.

To be sure, the Fourth Amendment "stands for" many things, and even construed in the light most favorable to Plaintiff, Officer Nelson's equivocation on the issue says almost nothing about the City's training policy. The issue is whether the City adequately trained its officers on the

probable-cause standard, not whether it trained them on the Fourth Amendment generally. And the undisputed testimony of Chief Ruth is that it did. *See* ECF No. 43-2 at PageID.884 (stating that the City trains its officers on "the Fourth Amendment and the probable cause standard").

Plaintiff criticizes Chief Ruth's affidavit as "after-the-fact" and "self-serving." ECF No. 47 at PageID.910. But those criticisms go to the weight of the affidavit, not its effect at summary judgment. *See Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021) ("As courts have explained, parties should avoid this 'self-serving' label because it does nothing to undermine the other side's evidence under Rule 56.") (collecting cases).

Moreover, Officer Nelson testified elsewhere in her deposition that she did understand the probable-cause standard, and that she did know it required her to consider the "totality of the circumstances." *See* ECF No. 32-12 at PageID.233–34; *see also id.* at PageID.231 (noting her bachelor's degree in criminal justice).

Plaintiff's reliance on the City's policy memo is similarly misplaced. The memo is based on Michigan's statute governing warrantless arrests; hence the use of the statutory term "reasonable cause" instead of "probable cause." *Compare* ECF No. 34-20 at PageID.558, *with* MICH. COMP. LAWS § 764.15(a). Plaintiff's only objection to the term "reasonable cause" is that it might be confused for "reasonable suspicion," but Michigan courts interpret the two terms the same. *See People v. Cohen*, 816 N.W.2d 474, 477 (Mich. Ct. App. 2011). And, as a general matter, Michigan's statute is generally more demanding of police than the Fourth Amendment. *Compare United States v. Marls*, 227 F. Supp. 2d 708, 711 (E.D. Mich. 2002) ("An officer may not effect an arrest for a misdemeanor [under Michigan law] without a warrant unless the misdemeanor was committed in the officer's presence." (citing MICH. COMP. LAWS § 764.15(a)), *with United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996) ("[T]he requirement that a misdemeanor must have

occurred in the officer's presence to justify a warrantless arrest is not mandated by the Fourth Amendment.").

Finally, even if the memo were evidence of inadequate training, inadequate training alone does not establish a basis for single-incident liability. *See Ouza*, 969 F.3d at 289 ("[The] *complete failure* to provide *any* type of training as to [probable cause and excessive force] may amount to deliberate indifference under *City of Canton v. Harris* and its progeny." (emphasis added)).

For these reasons, no reasonable juror could find that the City failed to train its officers on the probable-cause standard such that single-incident liability would be appropriate.

**ii.**

Plaintiff next argues that the City is liable for failing to supervise the Officer Defendants. ECF No. 34 at PageID.430–32. Specifically, he faults Detective Busch for not "review[ing] any audio or video evidence of the alleged crime . . . , listen[ing] to the 911 call, or interview[ing] any witnesses." *Id.* at PageID.431. He notes that, rather than conducting his own investigation, Detective Busch merely "present[ed] the paperwork to the prosecutor." *Id.* (quoting ECF No. 34-7 at PageID.495).

But, as Defendants explain, Detective Busch was not assigned to supervise the Officer Defendants. ECF No. 43 at PageID.876. That role was filled by Police Chief Robert Ruth and Lieutenant David Kendziorski, neither of whom are mentioned in Plaintiff's briefing. *Id.*

Moreover, Plaintiff has not shown or alleged a pattern of constitutional abuses that would allow a reasonable jury to infer deliberate indifference. *See Ouza*, 969 F.3d at 287 (requiring evidence of a "fail[ure] to act 'in response to repeated complaints of constitutional violations by its officers'" (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003))).

Consequently, Plaintiff's failure-to-supervise theory must be rejected.

**iii.**

In summary, the City of Saginaw is entitled to summary judgment on Plaintiff's failure-to-train/supervise claim, because no reasonable juror could find that the City was deliberately indifferent to Plaintiff's rights.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 32, is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion is **GRANTED** as to the request to dismiss the City of Saginaw and Detective Patrick Busch. Defendants' motion is **DENIED** in all other respects.

Further, it is **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 34, is **DENIED**.

Further, it is **ORDERED** that Plaintiff's claims against the City of Saginaw and Detective Busch are **DISMISSED**.

**This is not a final order and does not close the case.**

Dated: May 20, 2022                             s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge